## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **CONNIE JEAN COFFEE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 4:18-cv-00028-MHH** |
| | } | |
| **ANDREW SAUL, Commissioner of** | } | |
| **the Social Security Administration,[1]** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. § 1383(c), plaintiff Connie Jean Coffee seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Coffee's claim for supplemental security income. For the reasons stated below, the Court remands the Commissioner's decision for additional proceedings.

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d) (When a public officer ceases holding office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

## I. PROCEDURAL HISTORY

Ms. Coffee applied for supplemental security income. (Doc. 8-4, p. 2). She alleges that her disability began on May 17, 2014. (Doc. 8-4, p. 2). The Commissioner initially denied Ms. Coffee's claim. (Doc. 8-4, p. 2). Ms. Coffee requested a hearing before an Administrative Law Judge (ALJ). (Doc. 8-5, p. 10). The ALJ issued an unfavorable decision. (Doc. 8-3, pp. 14-27). The Appeals Council declined Ms. Coffee's request for review, making the Commissioner's decision final for this Court's judicial review. (Doc. 8-3, p. 2). *See* 42 U.S.C. § 1383(c).

## II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide

the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then this Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.  SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

The ALJ determined that Ms. Coffee had not engaged in substantial gainful activity since her application date of October 2, 2014. (Doc. 8-3, p. 16).[2] The ALJ determined that Ms. Coffee suffers from the following severe impairments: bipolar I disorder, ADHD combined type, crystal meth induced disorder, polysubstance abuse in remission, degenerative disc disease of the cervical and lumbar spine, and panic disorder in partial remission. (Doc. 8-3, p. 16). The ALJ did not identify non-severe impairments. (Doc. 8-3, p. 16). Based on a review of the medical evidence, the ALJ concluded that Ms. Coffee does not have an impairment or a combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 8-4, pp. 16-19).

Given Ms. Coffee's severe impairments, the ALJ evaluated Ms. Coffee's residual functional capacity. The ALJ determined that Ms. Coffee has the RFC to perform light work with restrictions. (Doc. 8-3, p. 19).

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when

---

[2] Social Security disability insurance benefits are available only to insured claimants. An insured claimant is one who has "worked long enough and paid Social Security taxes. Unlike [disability insurance] benefits, [supplemental security income] benefits are not based on . . . prior work or a family member's prior work." https://www.ssa.gov/ssi/text-over-ussi.htm (last visited Jan. 23, 2020). Consequently, when a claimant seeks supplemental security income, but not disability insurance benefits, a disability onset date is not part of the analysis. Instead, the ALJ must verify that the claimant has not worked in a gainful capacity since filing the application.

it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, . . . [normally] he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b). In an eight-hour day, the ALJ limited Ms. Coffee to four hours of standing and walking and six hours of sitting. (Doc. 8-3, p. 19). The ALJ found that Ms. Coffee can lift five pounds frequently and ten pounds occasionally with her left extremity; one pound frequently with her right extremity. (Doc. 8-3, p. 19). The ALJ restricted Ms. Coffee to occasional overhead reaching and frequent forward reaching, handling fingering, and feeling. (Doc. 8-3, p. 19). The ALJ found that Ms. Coffee could occasionally climb, balance, kneel, crouch, or crawl. (Doc. 8-3, p. 19). The ALJ determined that Ms. Coffee could perform jobs with "no specific production quota" and "infrequent contact with the general public." (Doc. 8-3, p. 19).

The ALJ determined that Ms. Coffee lacks past relevant work. (Doc. 8-3, p. 25). Relying on testimony from a vocational expert, the ALJ found that Ms. Coffee could perform the job of surveillance systems monitor, an unskilled sedentary job that exists in the national economy. (Doc. 8-3, p. 26). Accordingly, the ALJ denied Ms. Coffee's disability claim. (Doc. 8-3, p. 27).

## IV. ANALYSIS

Ms. Coffee argues that she is entitled to relief from the ALJ's decision because the ALJ did not properly evaluate the medical opinion evidence. Ms. Coffee relies on the opinions of Dr. Feist and Dr. Nichols. (*See* Doc. 10, pp. 17-27). Dr. Feist treated Ms. Coffee for more than two years. (Doc. 8-12, p. 3; Doc. 8-21, p. 35). Dr. Feist prescribed the medicine Ms. Coffee used to treat her bipolar disorder after Ms. Coffee's release from the Gadsden Regional Medical Center's adult psychiatric unit in April 2014. (Doc. 8-13, p. 31; Doc. 8-12, p. 21). Dr. Nichols, a clinical psychologist, evaluated Ms. Coffee at the request of the Commissioner. (Doc. 8-12, pp. 44-48). The ALJ gave little weight to Dr. Feist's opinion. (Doc. 8-3, p. 24). The ALJ discussed but did not assign weight to Dr. Nichols's opinion. (Doc. 8-3, pp. 21-22). In formulating Ms. Coffee's residual functional capacity, the ALJ gave great weight to the opinion of Dr. Williams, an agency medical consultant. (Doc. 8-3, p. 25). The ALJ relied on the opinion of Dr. Ernst, a consultative examiner, to support the physical components of Ms. Coffee's RFC. (Doc. 8-3, p. 22). To evaluate Ms. Coffee's argument concerning the ALJ's treatment of the evidence, the Court begins with Ms. Coffee's medical history and then discusses the medical opinion evidence.

*Ms. Coffee's Medical History*[3]

In February 2014, following her release from prison, Ms. Coffee sought treatment at CED Mental Health Center. (Doc. 8-12, p. 4).[4] Ms. Coffee met with a CED counselor. (Doc. 8-12, p. 4). Ms. Coffee reported that she had received treatment for depression and bipolar disorder while in custody. (Doc. 8-12, p. 4). According to the February 2014 intake record, Ms. Coffee had a one month supply of medication. (Doc. 8-12, p. 4). Ms. Coffee stated during the intake process that she was seeking help because "I'm bipolar and need to stay on medications." (Doc. 8-12, p. 7).

Ms. Coffee answered questions about her mental state during the February 2014 visit. (Doc. 8-12, pp. 9-10). She described periods of "feeling 'up' or 'high' or 'hyper' or so full of energy . . . that [she] got into trouble, or that other people thought [she] [was] not [her] usual self." She also reported anxiousness, fear,

---

[3] The Court has considered Ms. Coffee's medical information that predates May 2014. (*See, e.g.*, Doc. 8-9, pp. 3-8) (February 2006 records from Grand View Behavioral Health Center); (Doc. 8-11, pp 2-78; Doc. 8-10, pp. 2-121) (February 2007 to June 2010 records from Riverview Regional Medical Center); (8-13, pp. 32-38) (September 2010 records from Quality of Life Health Services, Inc. and Quest Diagnostics Incorporated); (Doc. 8-13, pp. 42-45) (January 2006 records from Doctors Med Care of Gadsden, P.C.); (Doc. 8-13, pp. 47-62) (January 2012 to August 2012 records from CED); (Doc. 8-14, pp. 2-30; Doc. 8-15, pp. 2-28; Doc. 8-16, pp. 2-12; Doc. 8-17, pp. 2-27; Doc. 8-18, pp. 2-11; Doc. 8-19, pp. 2-18; Doc. 8-20, pp. 2-26) (January 2013 to February 2014 records from Alabama Department of Corrections); (Doc. 8-21, pp. 2-29) (February 2001 to September 2003 records from CED); (Doc. 8-21, pp. 30-32) (February 2012 to May 2012 records from CED). Many of these pre-onset documents support Ms. Coffee's longitudinal history of mental health symptoms and treatment. For purposes of this opinion, the Court focuses on records dated shortly before or within the claimed disability period.

[4] CED stands for Cherokee Etowah DeKalb. (Doc. 8-12, p. 2).

uncomfortableness, or uneasiness that "surge[d] to a peak, within 10 minutes of starting." (Doc. 8-12, p. 9). Ms. Coffee reported that in the previous six months, she had experienced excessive anxiousness or worry "about several routine things." (Doc. 8-12, p. 10).

In mid-April 2014, a CED therapist completed a problem assessment form for Ms. Coffee. (Doc. 8-12, pp. 11-15). According to this record, Ms. Coffee reported that she was bipolar, and she had spent 17 months in prison after a cocaine-related arrest. (Doc. 8-12, p. 11). The therapist noted that Ms. Coffee was "restless and tearful." (Doc. 8-12, pp. 11, 13). Ms. Coffee shared that she had run away from family recently and "stay[ed] gone for several days." (Doc. 8-12, p. 11). Ms. Coffee stated that she had received inpatient mental health treatment from CED in 2013 and outpatient treatment from Mountainview but did not recall the dates. (Doc. 8-12, p. 11). Ms. Coffee reported that her most recent job was with a restaurant in 2010. (Doc. 8-12, p. 13). According to Ms. Coffee, she had last used cocaine in October 2011 and methamphetamine in 2006. (Doc. 8-12, p. 13). Ms. Coffee reported attempting suicide in 2001 and 2009. (Doc. 8-12, p. 13).

The therapist characterized Ms. Coffee's symptoms as chronic, (Doc. 8-12, p. 14), and recommended "individual therapy [and] medication management," (Doc. 8-12, p. 15). The therapist diagnosed Ms. Coffee with bipolar I disorder (depression as the most recent episode), combined attention deficit hyperactivity disorder,

hypoglycemia, and mitrovalve prolapse. (Doc. 8-12, p. 15).[5] The therapist assessed

50 as Ms. Coffee's GAF score. (Doc. 8-12, p. 15).[6] According to the therapist, Ms.

Coffee had occupational, economic, legal, and psychological problems. (Doc. 8-12,

p. 15). Later in April 2014, a CED medical doctor or licensed psychologist—the

signature is illegible—accepted the therapist's diagnosis of Ms. Coffee. (Doc. 8-12,

p. 15).

---

[5] According to Healthline.com, bipolar disorders

> are characterized by episodes of extreme mood. The highs are known as manic episodes. The lows are known as depressive episodes. The main difference between bipolar 1 and bipolar 2 disorders lies in the severity of the manic episodes caused by each type. A person with bipolar 1 will experience a full manic episode, while a person with bipolar 2 will experience only a hypomanic episode (a period that's less severe than a full manic episode). A person with bipolar 1 may or may not experience a major depressive episode, while a person with bipolar 2 will experience a major depressive episode.

https://www.healthline.com/health/bipolar-disorder/bipolar-1-vs-bipolar-2 (last visited Feb. 19, 2020).

"Combined type ADHD is where both inattention and hyperactivity/impulsivity are present." https://www.verywellmind.com/what-is-adhd-combined-type-4135385 (last visited Jan. 28, 2020).

[6] GAF stands for "Global Assessment of Functioning," and the "GAF Scale" may be used to report an individual's "overall functioning." *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR), p. 32, American Psychiatric Association (4th ed. text revision, 2000). "The GAF Scale is to be rated with respect only to psychological, social, and occupational functioning. . . . [and] is divided into 10 ranges of functioning." DSM-IV-TR, p. 32. The later *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), American Psychiatric Association (5th ed. 2013), no longer refers to the GAF Scale and includes a different global functioning measure–"the WHO Disability Assessment Schedule (WHODAS) ...." DSM-5, p. 16.

A GAF score of 50 suggests "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." https://www.webmd.com/mental-health/gaf-scale-facts (last visited Jan. 30, 2020).

In late April 2014, the Etowah County Probate Court granted a petition for Ms. Coffee's involuntary commitment, and Ms. Coffee was admitted to the Gadsden Regional Medical Center's adult psychiatric unit. (Doc. 8-12, p. 24; Doc. 8-13, pp. 38-40). Ms. Coffee was in the unit five nights. (Doc. 8-12, p. 21). Dr. Morton was the attending physician during Ms. Coffee's admission and discharge. (Doc. 8-12, p. 24; Doc. 8-12, p. 21). Dr. Morton summarized the commitment petition: Ms. Coffee had stopped taking her psychiatric medication at the beginning of April 2014; had been repeating her words; had taken her sister's truck without permission and was gone for ten days; had experienced increased mood swings; had been yelling, cursing, and screaming; and had hit her sister in the face. (Doc. 8-12, p. 24); (*see also* 8-13, p. 39). Dr. Morton noted that Ms. Coffee felt that portions of the petition were exaggerated. (Doc. 8-12, p. 24). Still, Ms. Coffee acknowledged having a history of bipolar disorder. (Doc. 8-12, p. 24).

In her conversation with Dr. Morton, Ms. Coffee denied having a "significant problem with alcohol" but acknowledged having a cocaine problem, including a relapse from two years of abstinence one week before her commitment. (Doc. 8-12, p. 25). Ms. Coffee reported that she had symptoms of "lots of energy and racing thoughts," "little need for sleep," and disorganized thoughts. (Doc. 8-12, p. 24). Ms. Coffee denied psychotic symptoms or past psychiatric hospitalizations. (Doc. 8-12, pp. 24, 25). Ms. Coffee stated that she had been using Wellbutrin (75 mg twice

daily) and lithium (300 mg daily) to treat her symptoms for one year. (Doc. 8-12, pp. 24, 25).[7] According to Ms. Coffee, Wellbutrin was "very effective for her depression," but lithium caused "her hands and feet [to] swell." (Doc. 8-12, p. 24). Ms. Coffee stated that she did not want to take lithium. (Doc. 8-12, p. 24). Ms. Coffee also tried Depakote but did not like it. (Doc. 8-12, p. 25).[8]

Dr. Morton conducted a mental status examination and noted possible pressured speech and thought processing issues but "no overt thought disorder" or impaired judgment. (Doc. 8-12, p. 25). Ms. Coffee "described her mood as 'okay.'" (Doc. 8-12, p. 25). Dr. Morton's diagnosed Ms. Coffee with bipolar I disorder (most recent episode as manic and severe without psychosis) and cocaine abuse. (Doc. 8-12, p. 26). Dr. Morton assessed Ms. Coffee with a GAF score of 35. (Doc. 8-12, p. 26).[9] Dr. Morton recommended admitting Ms. Coffee to the unit for safety and

---

[7] "Wellbutrin is the brand name for bupropion, a prescription drug that's used to treat depression." https://www.everydayhealth.com/drugs/wellbutrin (last visited Jan. 28, 2020).

"Lithium is used to treat the manic episodes of bipolar disorder (manic depression). Manic symptoms include hyperactivity, rushed speech, poor judgment, reduced need for sleep, aggression, and anger. Lithium also helps to prevent or lessen the intensity of manic episodes." https://www.drugs.com/lithium.html (last visited Jan. 28, 2020).

[8] "Depakote is . . . used to treat manic episodes related to bipolar disorder (manic depression)." https://www.drugs.com/depakote.html (last visited Jan. 28, 2020).

[9] A GAF score of 35 suggests:

Some impairment in reality testing or communication (e.g., speech at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man

monitoring reasons.  (Doc. 8-12, p. 26).  Dr. Morton suggested "offer[ing] psychotherapeutic interventions to Ms. Coffee, such as recreational and occupational therapy."  (Doc. 8-12, p. 26).

During her hospitalization, Ms. Coffee took Wellbutrin and started using Abilify (10 mg daily initially; 15 mg daily upon discharge).  (Doc. 8-12, pp. 21, 22). Dr. Morton reported that Ms. Coffee adapted well to the unit and was pleasant and appropriate.  (Doc. 8-12, p. 21).  Staff began noticing "a rapid diminishing of [Ms. Coffee's] manic symptomatology" and reported that "[s]he was sleeping well." (Doc. 8-12, p. 21).  Ms. Coffee stopped showing "flight of ideas or pressured speech."  (Doc. 8-12, p. 21).  Dr. Morton reported that Ms. Coffee "was clearly doing much better" after several days of treatment.  (Doc. 8-12, p. 21).

According to Dr. Morton, Ms. Coffee did not have suicidal ideation, and no staff member observed signs that she was dangerous.  (Doc. 8-12, p. 21).  After a family visit, the unit determined that Ms. Coffee could return home safely because there no longer was an "indication that she was a danger to self or others . . . ."  (Doc. 8-12, p. 21).  Dr. Morton noted that Ms. Coffee's condition was "[m]uch improved"

---

avoids friends, neglects family, and is unable to work, child frequently beats up younger children, is defiant at home, and is failing at school).

https://www.webmd.com/mental-health/gaf-scale-facts (last visited Jan. 30, 2020).

and that her GAF score had increased to 55. (Doc. 8-12, p. 21).[10] According to another discharge document, the unit released Ms. Coffee because she had met her treatment goals, she denied suicidal or homicidal thoughts, and she showed an improved and stable thought process and mood. (Doc. 8-12, p. 27). Ms. Coffee's discharge medications were Abilify (15 mg daily) and Wellbutrin (75 mg twice daily). (Doc. 8-12, pp. 21, 29). Dr. Morton instructed Ms. Coffee to follow up with Dr. Feist at CED. (Doc. 8-12, p. 22).

Dr. Feist supervised much of Ms. Coffee's treatment at CED. Most of Ms. Coffee's medical records indicate that Dr. Feist is a physician at CED Mental Health Center. (*See*, *e.g.*, 8-21, p. 35). Dr. Feist is identified as a psychiatrist on https://doctor.webmd.com/doctor/fredric-feist-sr-f02f32a9-3a12-4942-bf90-72d0ba35d116-overview (last visited Jan. 30, 2020), but the title "physician" appears beneath his signature on most of Ms. Coffee's medical records. He prescribed Ms. Coffee's mental health medications. (*See, e.g.*, Doc. 8-12, p. 32). At least one record—Ms. Coffee's November 2014 treatment plan—shows that a psychiatrist was responsible for Ms. Coffee's monthly evaluations. (Doc. 8-12, p.

---

[10] A GAF score of 55 suggests "[m]oderate symptoms (e.g., flat and circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational, or social functioning (e.g., few friends, conflicts with co-workers)." https://www.webmd.com/mental-health/gaf-scale-facts (last visited Jan. 30, 2020).

39). Dr. Feist signed the plan as Ms. Coffee's psychiatrist/psychologist. (Doc. 8-12, p. 39).[11]

Ms. Coffee saw Dr. Feist at the end of April 2014 and complained of agitation and depression. (Doc. 8-12, p. 3). Dr. Feist noted that Ms. Coffee was taking Wellbutrin (75 mg) and lithium (300 mg). (Doc. 8-12, p. 3). Dr. Feist reported that Ms. Coffee had not made mental health progress and that she was suffering from anxiety, insomnia, poor insight and judgment, tangential and loose thought process, and hyperactivity. (Doc. 8-12, p. 3). Dr. Feist noted ADHD and bipolar disorder and assessed Ms. Coffee as a high-risk patient. (Doc. 8-12, p. 3). [12]

Dr. Bentley, who holds a Ph.D. and is a licensed professional counselor, updated Ms. Coffee's mental health assessment in early May 2014 at the Commissioner's request. (Doc. 8-12, pp. 33, 35). Dr. Bentley first evaluated Ms. Coffee in April 2010. (Doc. 8-12, p. 33). Dr. Bentley provided the following summary of Ms. Coffee's mental health treatment:

> [Ms. Coffee] admits to increasing anxiety, mood swings, irritability, depression and episodes of euphoria since 2002. She was previously evaluated at the CED Mental Health Center for a brief period of time in 2003. [Ms. Coffee] was also treated at Gadsden Psychological Services

---

[11] The Court was able to verify the title under Dr. Feist's signature by enlarging the image. (Doc. 8-12, p. 39). In another administrative appeal, Ms. Coffee's attorney, representing another claimant who Dr. Feist treated, stated that Dr. Feist is a psychiatrist who has practiced for years in Northern Alabama. *See Bryant v. Saul*, 19-22 (Feb. 28, 2020 minute entry).

[12] Many of Dr. Feist's notes are handwritten and, at times, difficult to decipher. Consequently, the Court discusses only those portions of Dr. Feist's handwritten notes that the Court understands.

in 2006 and diagnosed as having [b]ipolar [d]isorder.  The patient has not received any formal psychiatric treatment in the last 7 to 8 years.

[Ms. Coffee] is being treated by her PMD for symptoms stemming from her [b]ipolar [d]isorder.  Ms. Coffee was discharged from GRMC one week ago due to excessive swelling in her extremities x4.  A list of her medications accompanies this clinician's report.  She's only recently started her regimen of Neurontin and is uncertain as to the effectiveness of this drug.  There has been little improvement in her psychiatric symptoms as a result of her other medications.  [Ms. Coffee] has not been hospitalized for psychiatric reasons.

(Doc. 8-12, p. 33).[13]  Although Dr. Bentley mentioned Ms. Coffee's April 2014 stay at the Gadsden Regional Medical Center, he did not discuss Ms. Coffee's admission to the psychiatric unit.

Ms. Coffee told Dr. Bentley that she was experiencing "moderate to severe" insomnia and excessive anxiety.  (Doc. 8-12, p. 34).  Ms. Coffee also reported that she was assisting with household chores and completing activities of daily living unassisted.  (Doc. 8-12, p. 35).  Dr. Bentley described Ms. Coffee as alert, oriented, and appropriately dressed with an unremarkable appearance.  (Doc. 8-12, p. 34).  Dr. Bentley did not notice "obvious limitations" in Ms. Coffee's psychomotor or communication skills.  (Doc. 8-12, p. 34).  Dr. Bentley noted that Ms. Coffee's "tertiary and immediate memories were intact."  (Doc. 8-12, p. 34).  Dr. Bentley described Ms. Coffee as "reasonably cheerful" with a "mood congruent with her

---

[13] "Neurontin (gabapentin) is an anti-epileptic drug, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain." https://www.drugs.com/neurontin.html (last visited Jan. 30, 2020).

affect during the interview." (Doc. 8-12, p. 34). According to Dr. Bentley, Ms. Coffee appeared "mildly restless and anxious when discussing her history of substance abuse . . . ." (Doc. 8-12, p. 34). Dr. Bentley did not detect "evidence of phobias, obsessions or bizarre mentation." (Doc. 8-12, p. 34). Dr. Bentley tested Ms. Coffee's mental abilities in several ways. (Doc. 8-12, p. 34). Ms. Coffee was unsure how many weeks are in a year but otherwise demonstrated no deficits. (Doc. 8-12, p. 34).

Dr. Bentley diagnosed Ms. Coffee with crystal methamphetamine induced bipolar disorder, polysubstance abuse (in remission), probable cognitive disorder (secondary to a motor vehicle accident), and chronic pain in her cervical spine. (Doc. 8-12, p. 35). Dr. Bentley provided the following functional assessment:

> Ms. Coffee could be expected to have a moderate limitation in her ability to perform complex or repetitive work-related tasks as a result of her substance abuse and apparent onset of [] [b]ipolar [d]isorder. Ms. Coffee would function at a diminished pace when performing these activities. [Ms. Coffee] would appear capable of performing simple work-related tasks of a non-stressful nature. She would also appear capable of communicating effectively with coworkers and supervisors. Additional limitations based on the injuries to her cervical spine would need to be assigned by an appropriately trained physician.

(Doc. 8-12, p. 35).[14] Dr. Bentley detected no symptom exaggeration and found Ms. Coffee's prognosis for her level of functioning to be favorable. (Doc. 8-12, p. 35).

---

[14] Part 12.00 of the regulations governs mental disorders and listing 12.04 covers bipolar disorder. According to 12.00F, which listing 12.04 incorporates, a moderate limitation means that a person's ability to function "independently, appropriately, effectively, and on a sustained basis is fair" for

Ms. Coffee returned to Dr. Feist in November 2014, and her GAF score was 50. (Doc. 8-12, p. 37). During this visit, Ms. Coffee stated that she wanted "to be independent and financial[ly] stable." (Doc. 8-12, p. 37). According to Ms. Coffee's treatment plan, she wanted to reduce her days of depression from three to zero weekly. (Doc. 8-12, p. 39). To reach this goal, Ms. Coffee planned to learn three positive coping skills and comply with her medication regimen. (Doc. 8-12, p. 39). Ms. Coffee was to attend an individual therapy session once every six weeks, and she was to have a monthly psychiatric assessment. (Doc. 8-12, p. 39). Dr. Feist approved the plan by signing the psychiatrist/psychologist section. (Doc. 8-12, p. 39).

Dr. Nichols provided a mental health assessment of Ms. Coffee in early December 2014. (Doc. 8-12, p. 45). Ms. Coffee told Dr. Nichols that she (Ms. Coffee) "began having problems with depression in 2001," that she did not "'get any help and . . . got suicidal,'" that she started using drugs in 2002, and that her self-medication "'developed into a serious problem.'" (Doc. 8-12, p. 45). Ms. Coffee acknowledged drinking alcohol and using marijuana, crystal methamphetamine, cocaine, and crack. (Doc. 8-12, pp. 46-47). Ms. Coffee reported that she was hospitalized in 2006 at Mt. View Hospital because she was unable to sleep for

that work-setting area. https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm (last visited Feb. 20, 2020).

several days and "then would crash" and was hospitalized again in 2014 at Gadsden Regional Medical Center under the commitment order discussed above. (Doc. 8-12, p. 45). According to Ms. Coffee, she had difficulty functioning after her 2014 hospitalization because the doctor changed her medications, so she stopped taking them. (Doc. 8-12, p. 45). Because she did not comply with her medication regimen, Ms. Coffee did not report weekly to her probation officer and spent 90 days in county jail for violating the terms of her probation. (Doc. 8-12, p. 45).

Ms. Coffee stated that her then-prescribed medications were beneficial. (Doc. 8-12, p. 46). Ms. Coffee reported that she had stopped taking ADHD medication in 2011. (Doc. 8-12, p. 46). Ms. Coffee described memory deficits, low energy, and suicidal feelings when she experienced "the lows." Dr. Nichols listed Wellbutrin (150 mg daily) and Neurontin (300 mg twice daily) as Ms. Coffee's medications. (Doc. 8-12, p. 46).

Ms. Coffee reported that she last worked for her aunt and took care of elderly patients. (Doc. 8-12, p. 46). According to Ms. Coffee, she left because "she could not manage her pain" and perform the job. (Doc. 8-12, p. 46).

After conducting a mental status examination, Dr. Nichols noted that Ms. Coffee's appearance was appropriate, that her "[e]ye contact was good," and her "[s]peech was clear and rapid in rate." (Doc. 8-12, p. 47). Dr. Nichols described Ms. Coffee's mood as "anxious" and her affect as "agitated." (Doc. 8-12, p. 47).

Ms. Coffee reported sleeping two or three hours nightly, having a good appetite and "'plenty'" of energy, and experiencing crying episodes. (Doc. 8-12, p. 47). Ms. Coffee denied anhedonia and suicidal or homicidal thoughts. (Doc. 8-12, p. 47).[15]

Dr. Nichols did not detect cognitive deficits in orientation, concentration/attention, memory, fund of information, abstraction, thought processes and content, or judgment and insight. (*See* Doc. 8-12, pp. 47-48) (describing findings as "adequate," "fair," "normal," and "good"). Dr. Nichols estimated that Ms. Coffee was functioning in the average range of intellectual ability. (Doc. 8-12, p. 48). Dr. Nichols diagnosed Ms. Coffee with bipolar II disorder and combined ADHD and assigned a GAF score of 55. (Doc. 8-12, p. 48).

Dr. Nichols noted that Ms. Coffee cooperated during the examination. (Doc. 8-12, p. 48). Dr. Nichols found that Ms. Coffee's "[p]rognosis for significant improvement over the next 12 months [was] poor as Ms. Coffee has pursued help and yet had demonstrated little improvement with symptom resolution." (Doc. 8-12, p. 48). Dr. Nichols ended the report with the following findings:

> Ms. Coffee suffers symptoms of [b]ipolar [d]isorder, with rapid cycling that affects everyday activities. She has been unable to find the right medications to reduce symptoms. Her ability to relate interpersonally and withstand the pressures of everyday work is compromised due to the nature of her current symptoms. She reports three different closed head traumas that could cause deficits, which would interfere with her

---

[15] Anhedonia is "a psychological condition characterized by inability to experience pleasure in normally pleasurable acts." https://www.merriam-webster.com/dictionary/anhedonia (last visited Jan. 29, 2020).

ability to remember, understand and carry out work related instructions. She is able to handle her own funds and to live independently with the assistant of family.

(Doc. 8-12, p. 48).

Dr. Ernst, an anesthesiologist with MDSI Physician Services, examined Ms. Coffee in late December 2014 and provided a physical functional report. (Doc. 8-12, pp. 50, 54). Ms. Coffee primarily complained of daily neck pain that radiated to her right shoulder, arm, and fingers. (Doc. 8-12, p. 50). Ms. Coffee attributed the pain to a car accident decades earlier. (Doc. 8-12, p. 50). Ms. Coffee described the pain as "sharp to . . . achy" and rated it six out of ten. (Doc. 8-12, p. 50). According to Ms. Coffee, "[l]ooking up, standing more than 30 minutes, [and] reaching above her shoulders" increased her pain but weather changes did not have an impact. (Doc. 8-12, p. 50). Ms. Coffee reported dropping things with and experiencing weekly numbness in her right hand. (Doc. 8-12, p. 50). Ms. Coffee stated that she was sleeping three to four hours nightly. (Doc. 8-12, p. 50).

Ms. Coffee told Dr. Ernst that she lived with her boyfriend. (Doc. 8-12, p. 50). She reported that she could cook and handle some household chores. (Doc. 8-12, p. 50). Dr. Ernst listed polysubstance abuse, bipolar and obsessive-compulsive disorders, ADHD, and cervical degenerative disc disease as Ms. Coffee's medical history and listed Wellbutrin (150 mg daily) and Neurontin (300 mg twice daily) as her medications. (Doc. 8-12, p. 50).

Based on the interview process, Dr. Ernst described Ms. Coffee as "very hyper" with a short attention span. (Doc. 8-12, p. 53). Dr. Ernst's physical findings were mostly normal. (Doc. 8-12, pp. 51-53). Dr. Ernst detected a painful range of motion in Ms. Coffee's cervical region and decreased sensation in her right arm and fingers. (Doc. 8-12, p. 53). Ms. Coffee's straight leg raise test was positive on the right, creating "achy [and] pinching low back pain." (Doc. 8-12, p. 53).[16] Dr. Ernst diagnosed Ms. Coffee with degenerative disc disease in her neck (moderately severe but without a herniated disc) and back. (Doc. 8-12, p. 53).

Based on her degenerative disc disease, Dr. Ernst limited Ms. Coffee's standing and walking to four hours and limited her sitting to six hours. (Doc. 8-12, p. 54). Dr. Ernst found that Ms. Coffee could lift ten pounds occasionally and five pounds frequently with her left extremity. (Doc. 8-12, p. 54). Dr. Ernst restricted Ms. Coffee's use of her right extremity to one pound frequently. (Doc. 8-12, p. 54). Dr. Ernst determined that Ms. Coffee could reach overhead occasionally and reach forward, handle, finger, and feel frequently. (Doc. 8-12, p. 54). Dr. Ernst limited most postural activities to occasionally, except for climbing stairs frequently. (Doc.

---

[16] Examiners use the straight leg raise test to evaluate patients "with low back pain and nerve pain that radiates down the leg." https://www.ebmconsult.com/articles/straight-leg-raising-test (last visited Feb. 12, 2020).

8-12, p. 54).  Dr. Ernst found that Ms. Coffee should limit her exposure to hazardous materials, temperature extremes, chemicals, and gases.  (Doc. 8-12, p. 54).

During an early January 2015 visit with Dr. Feist, Ms. Coffee complained of hyperactivity.  (Doc. 8-13, p. 31).  According to the treatment record, Ms. Coffee exhibited an agitated and euphoric mood, fair insight, judgment, and motivation, loose thought processes, normal and obsessive thoughts, inadequate attention, and hyperactive behavior.  (Doc. 8-13, p. 31).  Dr. Feist classified Ms. Coffee's risk as moderate.  (Doc. 8-13, p. 31).  Dr. Feist noted that Ms. Coffee was taking Seroquel (50 mg twice nightly) and Neurontin (300 mg twice daily) for bipolar disorder and wanted to try a prescription for ADHD.  (Doc. 8-13, p. 31).  Dr. Feist recommended that Ms. Coffee try Strattera.  (Doc. 8-13, p. 31).[17]

Dr. Williams, a consulting physician, completed a physical and mental health assessment of Ms. Coffee in early January 2015.  (Doc. 8-4, pp. 3-17).  With respect to Ms. Coffee's mental health assessment, Dr. Williams found that she had moderate limitations in understanding and remembering instructions.  (Doc. 8-4, p. 16).  Dr. Williams stated that Ms. Coffee could "understand, remember, and carry out short[,] simple instructions and tasks, but would likely have difficulty with more detailed tasks and instructions."  (Doc. 8-4, p. 16).

---

[17] "Strattera (atomoxetine) . . . [is] used to treat attention deficit hyperactivity disorder (ADHD)." https://www.rxlist.com/strattera_vs_adderall/drugs-condition.htm (last visited Jan. 29, 2020).

Dr. Williams determined that Ms. Coffee had moderate concentration and persistence limitations in several areas, including "carry[ing] out detailed instructions," "maintain[ing] attention and concentration for extended periods," "perform[ing] activities within a schedule," "maintain[ing] regular attendance," "be[ing] punctual within customary tolerances," "sustain[ing] an ordinary routine without special supervision," "work[ing] in coordination with or in proximity to others without being distracted," and "complet[ing] a normal workday . . . without interruptions from psychologically based symptoms and . . . perform[ing] at a consistent pace without an unreasonable number and length of rest periods." (Doc. 8-4, p. 16). Dr. Williams stated that Ms. Coffee could pay attention and concentrate on uncomplicated tasks and instructions for two hours with rest breaks. (Doc. 8-4, p. 16). According to Dr. Williams, "[a] well-spaced work environment" would maximize Ms. Coffee's concentration level. (Doc. 8-4, p. 16). Dr. Williams stated that Ms. Coffee would miss one or two days of work monthly because of psychological symptoms. (Doc. 8-4, p. 16).

Dr. Williams found that Ms. Coffee had moderate limitations in interacting with the public and supervisors. (Doc. 8-4, pp. 16, 17). Dr. Williams explained that Ms. Coffee should have "infrequent and non-intensive" public contact and "tactful, constructive, and non-threatening" supervision. (Doc. 8-4, p. 17). Dr. Williams found that Ms. Coffee had moderate limitations in adapting to work changes. (Doc.

8-4, p. 17).  Dr. Williams stated that Ms. Coffee should experience workplace changes infrequently and gradually.  (Doc. 8-4, p. 17).

According to a CED progress note, Ms. Coffee missed a therapy appointment in late January 2015.  (Doc. 8-13, p. 30).

Ms. Coffee visited the emergency department of the Gadsden Regional Medical Center in February 2015 and complained of coughing and congestion.  (Doc. 8-12, p. 69).  Ms. Coffee saw Dr. Kadakia, the attending physician, and a nurse practitioner.  (Doc. 8-12, pp. 69, 70).  Ms. Coffee did not describe psychiatric symptoms.  (*See* Doc. 8-12, p. 70).  The providers noted that Ms. Coffee was "alert," in "mild distress," and "[c]ooperative."  (Doc. 8-12, p. 70).  According to the treatment record, Ms. Coffee did not complain of back or neck pain.  (Doc. 8-12, p. 69).  The providers detected no tenderness in Ms. Coffee's back and reported no abnormalities in Ms. Coffee's range of motion.  (Doc. 8-12, p. 70).  The providers diagnosed Ms. Coffee with an upper respiratory infection and discharged her.  (Doc. 8-12, p. 70).

In March 2015, Ms. Coffee returned to the emergency department of the Gadsden Regional Medical Center and complained of shortness of breath, chest pain, fever, coughing, and nausea.  (Doc. 8-12, p. 62).  Ms. Coffee saw Dr. Hunt, the attending physician.  (Doc. 8-12, p. 62).  Ms. Coffee did not describe psychiatric symptoms.  (Doc. 8-12, p. 62).  Dr. Hunt observed that Ms. Coffee was

"[c]ooperative" and "appropriate" in her mood and affect. (Doc. 8-12, p. 63). According to the treatment notes, Ms. Coffee complained of "chest wall" pain but not back or neck pain. (Doc. 8-12, p. 62). Dr. Hunt detected no tenderness in Ms. Coffee's back or extremities. (Doc. 8-12, p. 62). Dr. Hunt reported no abnormalities in Ms. Coffee's neck, her range of motion, or her strength. (Doc. 8-12, p. 62). Dr. Hunt diagnosed Ms. Coffee with pneumonia and discharged her with self-care instructions. (Doc. 8-12, pp. 64, 75).

Ms. Coffee saw Dr. Feist in April 2015. (Doc. 8-13, p. 29). According to the treatment record, Ms. Coffee exhibited an anxious and agitated mood, fair insight and motivation, poor judgment, tangential and loose thought processes, and hyperactive behavior. (Doc. 8-13, p. 29). Dr. Feist classified Ms. Coffee's risk as moderate. (Doc. 8-13, p. 29). Dr. Feist noted that Ms. Coffee's progress was minimal and that she had stopped taking Strattera because it caused nausea. (Doc. 8-13, p. 29). Dr. Feist issued prescriptions for Neurontin (300 mg twice daily) and Wellbutrin (150 mg daily).

Ms. Coffee visited Riverview Regional Medical Center in July 2015 and complained of chest pain. (Doc. 8-13, pp. 3, 7). Ms. Coffee was in the custody of the Etowah County Jail and arrived by transport. (Doc. 8-13, pp. 3, 7). Ms. Coffee's secondary diagnoses included anxiety and episodic mood and bipolar disorders. (Doc. 8-13, pp. 3, 7). Ms. Coffee stated she had "chronic neck stiffness due to a

previous neck injury," "generalized muscle and joint stiffness," and "anxiety and depression related to [her] medical condition." (Doc. 8-13, p. 8).

Dr. Sinha, the attending physician, described Ms. Coffee as "alert, awake, oriented, and in no acute distress." (Doc. 8-13, pp. 5, 9). Dr. Sinha detected no range of motion, extremity, neck, or spinal issues. (Doc. 8-13, pp. 5, 13). Dr. Sinha reported that Ms. Coffee was taking Wellbutrin and gabapentin (generic for Neurontin) for pain and mood disorder symptoms. (Doc. 8-13, p. 3). Another record from this visit shows that Ms. Coffee was taking trazodone (100 mg nightly). (Doc. 8-13, p. 7).[18] The procedure report revealed no abnormal cardiovascular findings for Ms. Coffee. (Doc. 8-13, pp. 19-22).

Ms. Coffee met with a CED therapist in October 2015 and updated her treatment plan. (Doc. 8-13, p. 28). The therapist noted that Ms. Coffee had not been able to take her medication while she was in a halfway house, and her symptoms were deteriorating, causing PMA. (Doc. 8-13, p. 28). PMA stands for "psychomotor agitation [and] is a state of motor restlessness and mental tension that requires prompt recognition, appropriate assessment and management to minimize anxiety for the patient and reduce the risk for escalation to aggression and violence." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5591519/ (last visited Feb. 19,

---

[18] "Trazodone is an antidepressant drug that's prescribed to treat the symptoms of depression." https://www.everydayhealth.com/drugs/trazodone (last visited Jan. 30, 2020).

2020).  The therapist scheduled an appointment with Dr. Feist that day.  (Doc. 8-13, p. 28).

Ms. Coffee told Dr. Feist that she had not been taking medication since the Etowah County Jail had released her to a halfway house.  (Doc. 8-13, pp. 27, 28).  Ms. Coffee complained of depression and mood swings.  (Doc. 8-13, pp. 27, 28).  Dr. Feist noted that Ms. Coffee had an anxious and labile mood.  (Doc. 8-13, p. 27).[19]  Dr. Feist described Ms. Coffee's progress as minimal, her insight, judgment, and motivation as fair, her thought processes as loose, her thought content as normal and obsessive, and her behavior as appropriate.  (Doc. 8-13, p. 27).  Dr. Feist diagnosed bipolar disorder (severe depression as most recent episode) and combined ADHD.  (Doc. 8-21, p. 33).  Dr. Feist discussed the benefits of medication with Ms. Coffee and instructed her to return in three months.  (Doc. 8-13, p. 27).

Ms. Coffee returned to the emergency department of Gadsden Regional Medical Center in late December 2015 and complained of a sore throat.  (Doc. 8-12, p. 55).  Ms. Coffee met with Dr. Daily, the attending physician, and a nurse practitioner.  (Doc. 8-12, pp. 55, 58).  Ms. Coffee did not describe psychiatric symptoms.  (Doc. 8-12, p. 55).  The providers noted that Ms. Coffee was "[a]lert,"

---

[19] "Mood lability is an emotional response that is irregular or out of proportion to the situation at hand. . . . [and] often evidenced by destructive or harmful behaviors. . . .  Mood lability is present in people with various mental illnesses, including bipolar disorder . . . .  Because of how disruptive mood lability can be, it can inhibit daily life and functioning." https://www.verywellmind.com/what-is-mood-lability-425304 (last visited Feb. 19, 2020).

in "no acute distress," and "[c]ooperative." (Doc. 8-12, pp. 56, 57). The providers did not detect tenderness in Ms. Coffee's back or extremities, and Ms. Coffee's range of motion and strength findings were normal. (Doc. 8-12, p. 56). The providers diagnosed Ms. Coffee with strep throat and released her to self-care. (Doc. 8-12, p. 57).

Dr. Feist renewed Ms. Coffee's Ritalin (20 mg) prescription in November 2015. (Doc. 8-13, p. 26).[20] According to a CED progress note, Ms. Coffee missed a therapy appointment in early December 2015. (Doc. 8-13, p. 25). Ms. Coffee contacted CED in late December 2015 and requested a refill of her Ritalin (20 mg) prescription. (Doc. 8-13, p. 24). Dr. Feist authorized Ms. Coffee's refill request. (Doc. 8-13, p. 24). Ms. Coffee missed another therapy appointment in early February 2016. (Doc. 8-13, p. 23).

Later in February 2016, Ms. Coffee visited the emergency unit of the Gadsden Regional Medical Center and complained of a sore throat. (Doc. 8-21, p. 37). Dr. Killingsworth was the attending physician. (Doc. 8-21, p. 37). Ms. Coffee did not complain of psychiatric, back, or neck symptoms. (Doc. 8-21, p. 37). Dr. Killingsworth described Ms. Coffee as "[a]lert" and in "no acute distress." (Doc. 8-21, pp. 38, 39). Dr. Killingsworth noted that Ms. Coffee was "[c]ooperative" and

---

[20] "Ritalin (methylphenidate) is a central nervous system stimulant. . . . used to treat . . . attention deficit hyperactivity disorder (ADHD)." https://www.drugs.com/ritalin.html (last visited Jan. 29, 2020).

"appropriate [in] mood [and] affect." (Doc. 8-21, p. 38). Dr. Killingsworth diagnosed Ms. Coffee with an oral ulcer and strep. (Doc. 8-21, pp. 38, 42). Dr. Killingsworth discharged Ms. Coffee. (Doc. 8-12, p. 39).

Ms. Coffee returned to CED in May 2016 to update her October 2015 treatment plan. (Doc. 8-21, p. 34). Ms. Coffee stated that she had not been taking medication for three months and was experiencing depression, hyperactivity, inattentiveness, and anxiousness. (Doc. 8-21, p. 34). The therapist described Ms. Coffee as "hyper-fidgety." (Doc. 8-21, p. 34). The therapist instructed Ms. Coffee to monitor her symptoms, reiterated the importance of keeping appointments, and scheduled appointments for May and July 2016 due to Ms. Coffee's PMA status. (Doc. 8-21, p. 34). Dr. Feist described Ms. Coffee's progress as "fair" during a later May 2016 visit. (Doc. 8-21, p. 35). According to Dr. Feist's notes, Ms. Coffee exhibited an anxious and labile mood, fair insight, judgment, and motivation, circumstantial thought processes, normal thought content, hyperactive and agitated behavior. Ms. Coffee was a moderate risk. (Doc. 8-31, p. 35).

Ms. Coffee met with a CED therapist in July 2016. (Doc. 8-21, p. 36). Ms. Coffee reported experiencing "mild depression a couple days" weekly and "some days of mood swings." (Doc. 8-21, p. 36). The therapist noted that Ms. Coffee appeared clean and appropriate and had a normal mood, affect, and orientation. (Doc. 8-21, p. 36). Ms. Coffee stated that she had run out of one medication two

weeks earlier which caused increased agitation. (Doc. 8-21, p. 36). The therapist instructed Ms. Coffee to monitor her symptoms and call in advance for refills to avoid gaps in medication. (Doc. 8-21, p. 36). The therapist scheduled an appointment for September 2016. (Doc. 8-21, p. 36).

Dr. Feist completed a mental health assessment of Ms. Coffee in December 2016. (Doc. 8-21, p. 44). According to the assessment, Ms. Coffee could not "understand, remember or carry out very short and simple instructions," "maintain attention, concentration and/or pace for periods of at least two hours," "perform activities within a schedule and be punctual within customary tolerances," "sustain an ordinary routine without special supervision," "adjust to routine and infrequent work changes, "interact with supervisors [or coworkers]," or "adhere to basic standards of neatness and cleanliness." (Doc. 8-21, p. 44). Dr. Feist stated that Ms. Coffee would be off-task 93 percent of an eight-hour day in addition to customary breaks. (Doc. 8-21, p. 44). Dr. Feist indicated that if Ms. Coffee stopped using drugs and alcohol, her mental condition would not improve "to the point of non-disability." (Doc. 8-21, p. 44). Dr. Feist noted that Ms. Coffee experienced side effects from her medication including seizures, mood swings, behavioral changes, anxiety, trouble sleeping, irritability, agitation, and aggressiveness. (Doc. 8-21, p. 44).

*Medical Opinion Evidence*

Ms. Coffee maintains that the ALJ did not properly evaluate the medical opinion evidence. In the Eleventh Circuit, an "ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel,* 631 F.3d at 1179 (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam)); *see also McClurkin v. Social Sec. Admin.*, 625 Fed. Appx. 960, 962 (11th Cir. 2015) (same). An ALJ must give considerable weight to a treating physician's medical opinion if the opinion is supported by the evidence and consistent with the doctor's own records. *See Winschel*, 631 F.3d at 1179. An ALJ may refuse to give the opinion of a treating physician "substantial or considerable weight . . . [if] 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1240-41; *see also Crawford*, 363 F.3d at 1159. "The ALJ must clearly articulate the reasons for giving less weight to a treating physician's opinion, and the failure to do so constitutes error." *Gaskin v. Comm'r, Soc. Sec. Admin.*, 533 Fed. Appx. 929, 931 (11th Cir. 2013). Generally, "the medical opinion of a specialist about medical issues related to his or her area of

specialty [is due more weight] than . . . the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5).

The opinion of a one-time examiner is not entitled to deference. *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (citing *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986)); *see also Eyre v. Comm'r, Soc. Sec. Admin.*, 586 Fed. Appx. 521, 523 (11th Cir. 2014) ("The ALJ owes no deference to the opinion of a physician who conducted a single examination: as such a physician is not a treating physician."). "The opinions of nonexamining, reviewing physicians . . . when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence." *Sharfarz*, 825 F.2d at 280 (citing *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir.1985) (per curiam)). An ALJ "is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (internal quotation marks omitted).

In challenging the ALJ's decision, Ms. Coffee argues that reversal is appropriate because the ALJ rejected the opinion of Dr. Feist, Ms. Coffee's "treating psychiatrist," and the opinion of Dr. Nichols, "the Commissioner's examining psychologist." (Doc. 12, pp. 2, 4). Citing *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995) and several district court cases, Ms. Coffee also contends that the ALJ improperly substituted his opinion for the opinion of Dr. Nichols. (Doc. 12, pp. 5-

6); *see Wilder*, 64 F.3d at 337 ("We are led to consider with a degree of suspicion the administrative law judge's decision to go against the only medical evidence in the case, that of a psychiatrist not retained by the applicant but appointed by the administrative law judge himself to advise on Wilder's condition.").

Dr. Feist opined that the limitations attributable to Ms. Coffee's mental impairments precluded Ms. Coffee from meeting the demands of gainful employment. (Doc. 8-21, p. 44). The ALJ gave little weight to Dr. Feist's opinion because "the record as a whole does not substantiate the restrictive assessment by Dr. Feist that [Ms. Coffee] was incapable of performing any work." (Doc. 8-3, p. 24). The ALJ stated that "the most recent records from Dr. Feist's own facility document completely normal findings (i.e. clean and appropriate appearance, euthymic mood, normal affect, [and] full orientation." (Doc. 8-3, p. 24).[21] The ALJ noted that Gadsden Regional Medical Center and Riverview Regional Medical Center records "document unremarkable findings" and reflect Ms. Coffee's denial of psychiatric symptoms. (Doc. 8-3, p. 24). For those reasons the ALJ discounted Dr. Feist's opinion.

---

[21] Euthymia means "a stable mental state or mood in those affected with bipolar disorder that is neither manic nor depressive." https://www.merriam-webster.com/medical/euthymia (last visited Jan. 28, 2020).

The ALJ's analysis of Dr. Feist's opinion proceeds from the assumption that Dr. Feist is a treating physician rather than a treating psychiatrist. (Doc. 8-3, p. 24). Psychiatrists are medical doctors who specialize in the "assessment and treatment of mental health disorders."[22]  Consistent with the Commissioner's duty to develop the record, given the conflicting information in Ms. Coffee's medical records concerning Dr. Feist's status, the ALJ should have clarified Dr. Feist's credentials and determined whether Dr. Feist's opinion regarding Ms. Coffee's mental health was entitled to greater weight than the opinion of a treating physician. *See Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.") (citing *Richardson v. Perales*, 402 U.S. 389, 400-401 (1971)).[23]

The ALJ also should have considered Dr. Feist's longitudinal treatment of Ms. Coffee and determined whether Dr. Bentley was a psychologist, such that his longitudinal psychological evaluation might provide a relevant comparison. If Dr. Bentley is a psychologist, then he would be an acceptable medical source. *See* 20

---

[22] https://www.webmd.com/mental-health/features/psychologist-or-psychiatrist-which-for-you#1. (last visited March 2, 2020).

[23] The ALJ's reliance on the GRMC and RRMC records to discount Dr. Feist's opinion may require additional consideration because Ms. Coffee did not visit either facility seeking mental health treatment. The ALJ's selective treatment of Ms. Coffee's CED records also may require further consideration. For example, a May 2016 record indicates that Ms. Coffee was in PMA status. (Doc. 8-21, p. 34).

C.F.R. § 404.1502(a) (acceptable medical sources for claims predating March 27, 2017, include licensed physicians and psychologists). According to Dr. Bentley's mental health assessment of Ms. Coffee, he is a Ph.D. and a licensed professional counselor. (Doc. 8-12, pp. 33, 35). "Psychologists have a doctoral degree in an area of psychology."[24] Consistent with *Sims*, the ALJ should have developed the record concerning Dr. Bentley's qualifications and determined whether to assign weight to Dr. Bentley's opinion. Dr. Bentley's opinion contains mental limitations that the ALJ did not include in Ms. Coffee's RFC. (*Compare* Doc. 8-3, p. 19 *and* Doc. 8-12, p. 35).

According to the record, Dr. Nichols is a clinical psychologist. Dr. Nichols concluded that Ms. Coffee's "ability to relate interpersonally and withstand the pressures of everyday work is compromised due to the nature of her current symptoms." (Doc. 8-12, p. 48). The ALJ noted that Dr. Nichols's statements "concerning [Ms. Coffee's] perceived abilities are not medical opinions per the regulations as they do not assess any actual limitations." (Doc. 8-3, p. 22). Still, the ALJ stated that he considered Dr. Nichols's statements "with the totality of the medical record." (Doc. 8-3, p. 22). The ALJ did not assign weight to Dr. Nichols's opinion. (Doc. 10, p. 21).

---

[24] https://www.webmd.com/mental-health/features/psychologist-or-psychiatrist-which-for-you#1. (last visited March 2, 2020).

The Commissioner acknowledges that the ALJ erred when he failed to assign weight to Dr. Nichols's opinion. (Doc. 11, p. 13); *Kemp v. Astrue*, 308 Fed. Appx. 423, 426 (11th Cir. 2009) (An "ALJ must 'state specifically the weight accorded to each item of evidence and why he reached that decision.'") (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). The Eleventh Circuit has recognized that an ALJ may implicitly assign weight in discussing the evidence. *See Kemp*, 308 Fed. Appx. at 426 ("[The ALJ] implicitly found that the VA disability ratings were entitled to great weight."). The Commissioner contends that the ALJ's treatment of Dr. Nichols's opinion was harmless error because Dr. Nichol's opinion was vague. (Doc. 11, pp. 13, 14); *see Mabrey v. Acting Comm'r of Soc. Sec. Admin.*, 724 Fed. Appx. 726, 727 (11th Cir. 2018) ("Irrelevant errors are harmless and do not require reversal or remand.") (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)). On remand, the ALJ should assign weight to Dr. Nichols's opinion and determine whether he should seek clarification from Dr. Nichols who examined Ms. Coffee at the Commissioner's request.

Ultimately, the ALJ gave great, determinative weight to the mental health assessment of a non-treating physician who reviewed Ms. Coffee's records. (Doc. 8-3, p. 25). Concerning Dr. Williams's opinion, the ALJ explained:

> The undersigned has taken into consideration the finding of non-disability made by State agency medical consultant, Samuel D. Williams, M.D., pursuant to Social Security Ruling 96-6p. Dr. Williams found that [Ms. Coffee] would likely have trouble with more

detailed tasks and instructions, but she could maintain attention and concentration for 2 hours with normal customary rest breaks, and that her social interaction should be infrequent and non-intensive with the public as well as her supervision should be tactful, constructive, and non-threatening (Exhibit B2A). Dr. Williams'[s] opinion was weighed as a statement from a non-examining expert source with extensive program knowledge. It was well supported and not inconsistent with the other substantial evidence as documented by the claimant's excellent response to her minimal ongoing treatment (i.e. normal findings found upon testing by Gadsden Regional Medical Center, the normal finding found upon testing by the vast majority of her treating therapist's reports with the CED Mental Health, as well as her minimal treatment over the prior year.). Accordingly, the undersigned gives Dr. Williams'[s] opinion great weight.

(Doc. 8-3, p. 25). In his opinion, the ALJ discussed only some of the limitations that Dr. Williams identified and incorporated few of those limitations into Ms. Coffee's the mental health restrictions in her RFC. (Doc. 8-3, pp. 19, 25).[25] The RFC mentions only two mental health restrictions—no specific production quota and infrequent contact with the general public. (Doc. 8-3, p. 19). On remand, the ALJ should consider whether other recommended mental health restrictions should be incorporated into Ms. Coffee's RFC.

---

[25] The ALJ did not include Dr. Williams's supervision limitation or the other moderate limitations that Dr. Williams described in his functional assessment including being punctual within customary tolerances, sticking to a schedule, staying on task without special supervision, being distracted by coworkers, and completing a normal workday because of psychologically-based symptoms. (Doc. 8-4, p. 16). The ALJ did not give a reason for excluding these limitations from his RFC assessment. Based on the vocational expert's testimony, the job of surveillance systems monitor may be consistent with these additional restrictions.

In sum, the ALJ did not provide sufficient reasoning to demonstrate that he conducted a proper legal analysis. Therefore, the Court reverses the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## V.    CONCLUSION

The Court remands this matter for further administrative proceedings consistent with this opinion.

**DONE** this 4th day of March, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE